AMUSEMENT ENTERPRISES, INC., Plaintiff, *v.* BENJAMIN FIELDING, as Commissioner of Licenses of the City of New York, et al., Defendants.

Supreme Court, Special Term, Kings County, July 26, 1946.

*Israel G. Seeger, Neil M. Leiblich* and *Abraham H. Brodsky* for plaintiff.

*John J. Bennett, Corporation Counsel* (*Charles C. Weinstein* of· counsel), for defendants.

HOOLEY, J. This action was brought by the plaintiff, the manu· facturer of a certain game known as Bank Ball, against the Commissioner of Licenses and the Police Commissioner of the City of New York. The plaintiff seeks to obtain a declaratory judgment to the effect that Bank Ball is a game of amusement and skill, that the operation of the game or the possession thereof does not violate section 982 of the Penal Law, that no license is required under the laws of the City of New York for the operation of the same, and plaintiff in its complaint asks injunctive relief, which relief upon the trial has been reduced to a request for an injunction restraining the defendants from destroying certain Bank Ball game machines until the ultimate decision of the courts of this State in this litigation.

The game in question is known as an alley roll game. During the trial three of the machines were produced in the courtroom and the game was played many times by several witnesses. The player, standing approximately fifteen feet from the receptacles, rolls in succession nine balls in an alley approximately two feet wide on a slight upgrade. As the ball gets near the receptacles hereinafter described the incline becomes

sharp, causing the ball to rise in the air and the ball falls in one of five receptacles. These receptacles are graduated in size and range from cylindrical form on one container to an irregular elliptical form on the other four containers. Each container has a score or number, the object of the game being to obtain the highest score from the rolling of the nine balls. The machine itself is L shaped, the rolling of the balls being along the comparatively horizontal portion thereof, the balls rising up behind a screen or grating in the perpendicular portion of the machine at the end of the sharp incline. At the top of the perpendicular portion of the machine an electrical scoring arrangement indicates in each game the number of balls rolled and the score of the player, which changes automatically after each ball is rolled. The insertion of a five-cent piece by the player releases the nine wooden balls, each larger than a baseball. The only effect of the deposit of the coin is this release of the balls. The balls are not propelled by machinery or any mechanical contrivance nor is their course controlled thereby. The alley is clear and unobstructed. There are no buffers or obstructions of any kind to deflect the ball from the path upon which the player may direct it. The balls may be bowled along the alley or caused to ricochet off the sides of the alley.

What determines whether the ball shall land in the container aimed for by the player is the course or direction of the ball and the force behind it in its propulsion. Given the proper course or direction with the proper amount of propulsion, the ball is sure to land in the receptacle aimed at by the player. The course and distance of the ball in its flight are solely in the hands of the player. The result depends entirely upon the skill of the player and a properly directed ball will always find its target.

It is difficult to conceive of any game which does not have present, to a more or less degree, the element of chance. This is true in basketball, tennis, billiards, bowling and golf, all of which have always been regarded as games of skill. There is no element of chance built into the machine either to control the speed or direction of the ball. In Bank Ball the player has as much control over the ball as has a basketball player, a golfer or a bowler. The targets on the machine in question are fixed and unobstructed. The inherent character and intrinsic value of the game and the contrivance on which it is played combine to make the same a game of skill and not a game of chance. As the machine is constructed no award is made or offered in connection with the operation of the same nor is it possible for a player to receive a free game or other return as the result of

attaining any score or in any other manner. The machine under consideration is substantially different from any machine involved in any reported case in this State.

The machine as constructed is not a gambling device. This is the essential difference between this case and the case of *International Mutoscope Reel Co., Inc.,* v. *Valentine* (247 App. Div. 130, affd. 271 N. Y. 622), which is hereafter more fully discussed. But the defendants urge that the machine is readily convertible into a gambling device contrary to the provisions of section 982 of the Penal Law. This question becomes academic in view of the finding that the game is a game of skill and hence not within the purview of that section. However, inasmuch as this decision will probably be reviewed by the appellate courts, it may be desirable for the Trial Court to rule upon it.

There is no proof that any gambler, amateur or professional, is interested in the game or its manufacture. The undisputed testimony is that no one connected with Bank Ball either as a manufacturer, repairman, salesman, operator or otherwise had ever possessed or until the time of this trial had even seen the parts necessary to make the machine into an alleged gambling game. Upon the trial the defendants produced a highly skilled engineer connected with the police department who was equipped with all the essential parts to make a change in the game which would permit the player to receive one free game for the five-cent coin deposited by him in the machine if he ran his score for the preceding game up to a given high predetermined score. The engineer required twelve minutes to make the change. The engineer testified that it would take an additional ten minutes to complete the job by soldering, insulating and properly securing the wires and that an additional five minutes would be required for the installation of a free play plug to make the game interchangeably a free play game and a normal game. No evidence was given as to the time required to acquire the parts necessary to make the change or as to the availability of such parts.

It is true, as plaintiff contends, that any mechanical or electrical device may be converted into something else by the distortion of its internal structure or the addition of extraneous parts and mechanism. The change by the defendants' engineer involved the installation of a new coin receiver, an electrical coil attached thereto and several feet of wire running to the back of the machine and then affixed to proper sockets. It is important to add that the addition of these parts made the machine readily discernible as a machine adapted to the giving

of a free game upon inspection by one familiar with such apparatus. In the opinion of the court, the game of Bank Ball is not " readily convertible " within the meaning of section 982 of the Penal Law.

The fact that the game is a game of skill and is not readily convertible is no doubt the reason for the attitude toward it upon the part of the Commissioner of Licenses and the Police Commissioner hereinafter more particularly discussed.

The plaintiff contends strenuously that the decision of Mr. Justice CUFF at Special Term denying the defendants' motion for judgment on the pleadings (N. Y. L. J., May 29, 1946, p. 2138, col. 5) and granting the plaintiff an injunction *pendente lite* (63 N. Y. S. 2d 661), establishes the law of the case on the question of procedure. The plaintiff points out that the defendants moved for judgment on the pleadings dismissing the complaint upon the ground that " the complaint * * * fails to state * * * a cause of action, that the subject matter of the complaint herein is not a subject for declaratory judgment, that the issues raised by the pleadings herein are disputed so that the subject matter of the complaint herein is not a proper subject for declaratory judgment, that the complaint herein is designed to circumvent the well established rule that equity will not restrain the enforcement of the criminal law; and on the further ground that the plaintiff has other forms of remedy; and an adequate remedy at law, is available to it " and the plaintiff argues that inasmuch as Mr. Justice CUFF denied the motion in all respects, the law of the case was established that plaintiff's procedure is proper and that this is a proper case for a declaratory judgment and injunctive relief, providing the allegations in the complaint have been sustained by the proof upon the trial. It is well settled that the law of this case was fixed by the decision at Special Term until the same was reversed upon appeal. (*Sterling Bag Co., Inc.*, v. *City of New York*, 169 Misc. 5, affd. 256 App. Div. 645, affd. 281 N. Y. 269; *Henry* v. *New York Post, Inc.*, 168 Misc. 247, affd. 255 App. Div. 973, affd. 280 N. Y. 842; *Aldrich* v. *Newburgh News Printing & Pub. Co.*, 70 Misc. 126; *Endurance Holding Corp.* v. *Kramer Surgical Stores, Inc.*, 227 App. Div. 582, 584.) However, in view of the fact that this case came to Special Term for trial upon a stipulation made during the pendency of argument before the Appellate Division (see 270 App. Div. 1020) of the appeals by the defendants from the two orders of Mr. Justice CUFF, one denying the motion for a dismissal of the complaint and the other granting the motion for a temporary injunction, the court has come to the conclusion

that it should make a decision upon the merits as to whether or not' the situation here presented is a proper subject for a declaratory judgment as to the rights of this plaintiff.

The failure to raise by answer any issue as to paragraphs " ELEVENTH ", " TWELFTH ", " THIRTEENTH ", " FOURTEENTH " and " SIXTEENTH " of the complaint leaves the following established and undisputed facts: (1.) Plaintiff's Bank Ball game is an " alley roll game " as defined in the Regulation with Reference to Alley Ball Games, filed with the City Clerk, July 30, 1938, by the Commissioner of Licenses of the City of New York.

(2.) The said regulation was revoked by the defendant, Benjamin Fielding, Commissioner of Licenses, on April 5, 1946.

(3.) A number of said Bank Ball games have heretofore been licensed by the Commissioner of Licenses of the City of New York under the terms of the aforesaid regulation.

(4.) All the licenses issued therefor have expired and the defendant, Benjamin Fielding, Commissioner of Licenses, has refused and continued to refuse to issue licenses for the said game under the said regulation until the time of his revocation of the said regulation.

(5.) The defendants caused summonses to be issued to persons operating said Bank Ball games under a rental arrangement with plaintiff upon the ground that said games were being operated without a license.

Upon these undisputed facts and the other evidence, the plaintiff asserts that the language of the Court of Appeals in the case of *New York Foreign Trade Zone Operators* v. *State Liquor Authority* (285 N. Y. 272) is decisive upon the question as to whether this case is a proper case for a declaratory judgment. In that case, the plaintiff corporation alleged that the State Liquor Authority had threatened to prevent plaintiff by injunction and otherwise from performing certain acts without obtaining a distiller's license from the State Liquor Authority. There the plaintiff sought a declaratory judgment that it might continue as a part of its business the manipulation of foreign merchandise by adding pure water to foreign distilled spirits, thus reducing the alcoholic " proof " and increasing the volume. Judge DESMOND, writing for the Court of Appeals, said at pages 276-277: " There can be no doubt that the necessary jural relation exists between plaintiff and defendants. Enforcement of the State Alcoholic Beverage Control Law (Cons. Laws, ch. 3-B) and the power to issue licenses thereunder is vested in the State Liquor Authority. (L. 1934, ch. 478, art. 2.) One of the acts

which the Authority may license is the operation of a rectifying plant. (Alcoholic Beverage Control Law, § 61, subd. 2.) 'By this action plaintiff seeks a determination whether it must procure such a license in order to perform the acts described in the complaint. *The necessity of a license may be the subject of an action for a declaratory judgment. (Chung Mee Restaurant Co. v. Healy, 86 N. H. 483; Pratter v. Lascoff, 261 N. Y. 509; Reed v. Littleton, supra.)* " (Italics supplied.)

In *Reed* v. *Littleton* (275 N. Y. 150), in which a declaratory judgment was refused, Chief Judge CRANE, writing for the court, said in part (p. 156): " If the question here were whether the penal statutes infringed the Constitution, *or whether plaintiff was required to obtain a license before engaging in his business* or whether the statute which was being enforced had been theretofore repealed, the courts could decree plaintiff's rights without impeding or interfering with the administration of the criminal law." (Italics supplied.)

The plaintiff urges that the necessary jural relation exists in this case between plaintiff and the defendants; that the power to issue licenses is vested in the License Commissioner; that plaintiff's Bank Ball game has heretofore been licensed by the commissioner under his Regulation with Reference to Alley Ball Games (Rules and Regulations of N. Y. City Agencies [1938-1946], p. 391) and that upon the expiration of the licenses so issued the commissioner refused to renew them and thereafter revoked the regulation under which they were licensed. By this action, the plaintiff seeks a determination as to whether a license is now required for its Bank Ball game.

The evidence discloses that the revocation of the aforesaid regulation created an uncertain and disputed jural relation not only between the License Commissioner and this plaintiff but also between the License Commissioner and operators of Skee Ball alleys.

Bank Ball is a game of a type similar to Skee Ball. The game of Skee Ball has been operated in the city for more than twenty years. Up to 1938 no license was required. On July 30, 1938, the Commissioner of Licenses filed with the City Clerk what purported to be " Regulation with Reference to Alley Ball Games ". The authority for the issuance of such regulations is not clear inasmuch as the Charter of the City of New York (1938) does not grant the power to make regulations to the Commissioner of Licenses as it does to various other commissioners such as the Police Commissioner, the Commissioner of

Parks and the Commissioner of Sanitation. In such regulations, the Commissioner of Licenses assumed thereby to require licenses thereafter for alley roll games. Then for the first time these alley roll games were licensed. The Commissioner of Licenses having revoked such regulations, the plaintiff urges that there is now no provision of law in the city of New York requiring the operator of an alley roll game to procure a license. The defendants point to article 5 of title B of chapter 32 of the Administrative Code of the City of New York (§ B32–1.0 *et seq.*) as authority for the necessity for a license. That article refers to the licensing of common shows. Section B32–40.0 of the Administrative Code defines a common show as follows: " § B32–40.0. - *Definitions.*—a. Whenever used in this article, the term ' common show ' shall include a carousel, ferris wheel, gravity steeplechase, chute, scenic cave, bicycle carousel, scenic railway, striking machine, switchback, merry-go-round, puppet show, ball game other than games of baseball, and all other shows of like character, a theatre, other than an open-air theatre, in which the seating capacity exceeds six hundred persons, and in which motion pictures only are exhibited."

Neither Bank Ball nor any other type of alley roll game was ever licensed or intended to be licensed under said article 5. The ball games " other than   *   *   *   baseball " to which the section had reference included such games as football, basketball, soccer and similar games. All of the activities listed in the common-show definition related to activities involving large numbers of people and not to a game rolled by one man in a store or a bar and grill. A Bank Ball game is not a common show within the meaning of article 5 aforesaid. If it were, there would have been no necessity for the issuance of the 1938 regulations. The defendants now seek to give a strained interpretation to article 5 which was never intended to require the licensing of an alley roll game. No provision either of the City Charter or the Administrative Code authorizes the issuance of such regulations. The city itself has given a practical construction to the meaning of the words " common show " by the issuance of the 1938 regulations which were unnecessary if the provisions of article 5 applied to alley roll games.

The city has also given a similar practical construction to article 5 as not applying to alley roll games by failing to require a license under article 5 prior to the 1938 regulations although alley roll games were in existence for many years prior to 1938. Article 5 is derived from section 60 of article 3 of chapter 3

of the Code of Ordinances of the City of New York as it existed prior to the adoption of the Administrative Code and has been in existence since 1923 and the language in the Administrative Code and the Code of Ordinances is substantially the same. If section 60 of article 3 of the Code of Ordinances applied to alley roll games, it is difficult to believe that the various license commissioners since 1923 would have been so derelict in their duty as to fail to enforce the licensing provision. In the court's opinion, they were not derelict because the Code of Ordinances and the Administrative Code did not require such licenses.

Further, the regulations made for licensing alley-roll games in 1938 do not conform to the common-show provisions contained in the Administrative Code. The license fee could be different under the regulations from that specified in the Administrative Code. The period for which licenses could be issued was three months under the regulations whereas article 5 of the Administrative Code required a period of one year. No provision was made in the regulations for attendant's licenses although the same was required by article 5 aforesaid.

In *Matter of Executive Service Corp.* v. *Moss* (256 App. Div. 345) the court said at page 347: " The Commissioner of Licenses has no power to declare a legislative policy or to create standards with respect to the granting or exercise of a license. His duty is merely to apply the declared policy and the rules and standards laid down in statute and ordinance. * * * (*Matter of Small* v. *Moss*, 279 N. Y. 288; *Matter of Pecone* v. *Commissioner of Licenses*, 241 id. 157; *Matter of Larkin Co.* v. *Schwab*, 242 id. 330.) "

The question whether a license is required for the operation of plaintiff's Bank Ball game is a question of law, the determination of which will serve some practical end in quieting and stabilizing an uncertain or disputed jural relation which is in general the purpose of a declaratory judgment (*James* v. *Alderton Dock Yards*, 256 N. Y. 298, 305).

A declaratory judgment that no license is required under the Administrative Code of the City of New York for the operation of plaintiff's Bank Ball game will not interfere with the enforcement of the criminal law. No penal statute is involved in such determination. There is involved only the court's construction of article 5 of title B of chapter 32 of the Administrative Code of the City of New York, entitled " Common Shows ". The said regulations of 1938 having been revoked, there remains the question of law as to whether a license is now required by

article 5 aforesaid for the operation of the game in question. The facts here presented bring the case within the scope of the power vested by statute in the Supreme Court by section 473 of the Civil Practice Act, viz.: " * * * to declare rights and other legal relations on request * * * " according to the tests laid down by the Court of Appeals in *New York Foreign Trade Zone Operators* v. *State Liquor Authority* (285 N. Y. 272, *supra*). The controversy involves rights and legal relations. The meaning and legality of the provisions of a code of laws and regulations, having the force of laws, are involved and as indicated before no restraint of the enforcement of the criminal law is involved.

The evidence indicates that the licenses heretofore issued for Bank Ball games were not issued under the Common-Show provisions of the Administrative Code.

The License Commissioner having revoked the regulations, there is no longer any requirement under the Administrative Code of the City of New York for the licensing of the operation of plaintiff's Bank Ball game.

Although the defendants contend with obvious intensity and sincerity that the operation or possession of the game in question is a violation of the criminal law, there has been no arrest or criminal prosecution for any such alleged violation instituted by the Police Commissioner or his department or by any of the district attorneys of the five counties in the city, and this, despite repeated challenges and offers to submit to arrest on the part of the plaintiff's representatives in order that the legality of the game might be properly determined in the criminal courts. The extent of the efforts of the police department to enforce any criminal statute against this plaintiff is to characterize the game publicly as a gambling device and to warn operators thereof not to use the same.

This apparent refusal on the part of the enforcement officers of the criminal law to test the legality of the game in the normal way, in a criminal prosecution, is urged by the plaintiff as a strong reason in and of itself for a resort to a court of equity to have its rights determined in an action for a declaratory judgment. This alleged attitude on the part of the officials charged with the enforcement of the criminal law is, according to plaintiff, paralleled by the refusal of the Commissioner of Licenses to issue any license for the operation of the game followed by the summons of the operator to court, not for operating an illegal machine but for operating the same without a license.

Of course, it would be highly presumptuous upon the part of this court to criticize the conduct of the officials in the matter of the methods adopted by them for the protection of the public, but these are matters to be taken into consideration by the court in connection with the claim of the defendants that the plaintiff has an adequate remedy at law and in connection with whether the discretion of the court should be here exercised to issue a declaratory judgment.

The remedy urged by the defendants is that plaintiff should test out the legality of the machine in question in a mandamus proceeding to compel the Commissioner of Licenses to issue a license for the operation of the machine. In *New York Foreign Trade Zone Operators* v. *State Liquor Authority* (285 N. Y. 272, *supra*) Judge DESMOND said, at page 278, where the necessity of a license was the question at issue: " The courts below have held that there are other remedies available to plaintiff by which its rights may be adequately protected. The remedies referred to are of a negative character. Plaintiff can bring no other action, but it can wait and defend an action by defendants or any taxpayer residing in the locality for an injunction, when and if such an action is brought. (Alcoholic Beverage Control Law, § 123.) Meanwhile, although the facts are not disputed, it runs the risk of a criminal prosecution. (Alcoholic Beverage Control Law, § 130.) *Whether a defense ever may be considered another adequate remedy so as to warrant a denial of declaratory relief, the defense here said to be available to plaintiff certainly is not an adequate remedy.* (*Kalman* v. *Shubert*, 270 N. Y. 375.)

" This is a case where a declaratory judgment will quiet a disputed jural relation involving only questions of law, and where other forms of action are not reasonably adequate. Under the circumstances the complaint should not have been dismissed." (Italics supplied.)

It is to be remembered that the plaintiff claims that no license is necessary. Mandamus is not the remedy, therefore, for the plaintiff. It apparently cannot, because of the attitude of defendants, test out in a criminal prosecution the legality of its machine or the necessity for a license.

Although there was an attempt made upon the trial by innuendo to connect the men composing the plaintiff corporation with criminal interests and characters, it is fair to state that such attempt was unsuccessful. The men interested in plaintiff corporation appear to be law-abiding citizens who want

their legal rights determined. The plaintiff is a manufacturer of the game in question, about 1,000 of which are in use in this and other States, and the plaintiff has in process of manufacture about 700 others for delivery outside of the city of New York. The plaintiff is fearful that unless its legal rights are adjudicated there is danger that some of these machines may be destroyed by the police.

The machine in question is in no sense a pinball machine in which game the balls are propelled by a small spring plunger up an enclosed runway and out upon the upper portion of the playing surface which is studded with strategically placed bumpers, obstructions, deflecting pins and direction changers, which interfere with the course of the ball, rendering skill of little avail and making the game essentially a game of chance. Usually such games are definitely designed to be gambling machines.

The court is not so naïve as to be insensible to the demoralizing influence of gambling nor is it unaware of the increasing tendency on the part of large numbers of people to engage in such activity. It recognizes gambling to be a vice which is detrimental to society. But, as heretofore pointed out, no evidence has been presented here to indicate that the machine in question is a gambling device.

The case is distinguishable from the case of *Reed* v. *Littleton* (275 N. Y. 150, *supra*) and *Guide Escort Service, Inc.,* v. *Moss* (176 Misc. 66, affd. 260 App. Div. 920), two of the cases upon which defendants rely. In each of these cases, the plaintiff prayed for a declaratory judgment as to the legality of " a course of conduct " or a " transaction ", the nature of which was in dispute and open to interpretation. The court pointed out in each of said cases that at a later date the District Attorney might be able to present to the court additional evidence which would give a different color to the whole transaction. But here we are not concerned with a dispute as to facts but with a fixed game with fixed mechanical devices of fixed characteristics.

*International Mutoscope Reel Co., Inc.,* v. *Valentine* (247 App. Div. 130, affd. 271 N. Y. 622, *supra*) was a case in which the legality of a machine known as a crane, claw and digger machine was involved. In that case, upon which the defendants mainly rely, the court did refuse to issue a declaratory judgment to the plaintiff but in such case the Appellate Division had properly determined that the machine in question was a gambling device

(247 App. Div. 130). That alone was sufficient to justify a refusal to issue a declaratory judgment. In that case it appeared also that prizes were given away and that the engineer of the city testified that he spent fifty-five nickels in a futile attempt to obtain an eighty-nine cent alarm clock. In that case, also, the court at Special Term found that there were elements of chance in the operation of the appellant's machines. Among those elements of chance enumerated by the court were the following: (1) that the player had no control over the operation of the machine after the insertion of a coin; (2) that the ability of the player to cause the removal of any particular article "depends, to a large degree, upon the method used in placing such merchandise" in the machine; (3) that the digger "even though it contacts and grasps an article of merchandise does not always emit same from the machine", and (4) that "during the playing of the machine the two chains holding the digger frequently become twisted" and do not pull at the same time. In addition, Mr. Justice STEUER, in denying the application for an injunction at Special Term, said in part: "It is perfectly apparent and practically admitted by the plaintiffs that the machine can be operated in such a manner as to constitute a fraud upon the player."

It is no wonder, therefore, after such determinations by the trial court and after the Appellate Division had, as heretofore indicated, characterized the machine as unquestionably a "gambling device" (247 App. Div. 130) that the Court of Appeals merely said, and said only (271 N. Y. 622): "Judgment affirmed, with costs, upon the ground that the case is not one for a declaratory judgment. No opinion."

It is urged by defendants that where facts are in dispute upon any issue a declaratory judgment involving such issue may not be had. That is not the law. There is nothing in the Civil Practice Act which so provides. Furthermore, rule 213 of the Rules of Civil Practice clearly recognizes that a declaratory judgment may be had in cases involving disputed questions of fact and the court may even direct such questions of fact to be tried by a jury. In some of the early cases involving declaratory judgments, when the courts were feeling their way in this relatively new procedure, it was set forth in various opinions that no disputed questions of fact were involved. This was a statement set forth in connection with the granting of the declaratory judgment to indicate the simplicity of the issue but it was not intended to indicate that such procedure could not be availed of where disputed questions of fact were involved. The reiteration

in various opinions of the statement that no disputed questions of fact were involved have, however, built up in the minds of many a feeling that a declaratory judgment could not be had if the facts were in dispute. The situation is now becoming more clear. In *Chase National Bank* v. *Raleigh Estates, Inc.* (266 App. Div. 864), the court said: " The circumstance that a factual situation is involved presents no reason for the court, in the exercise of its discretion, to deny to plaintiff the remedy of declaratory judgment where, as in the instant case, there is a justiciable controversy between the parties, which renders the granting of such relief not only useful but necessary. (Rules Civ. Prac., rule 213; 5 Carmody, New York Practice, § 1973; Borchard on Declaratory Judgments, pp. 392, 393 and cases cited therein.) "

The plaintiff is entitled to a declaratory judgment: (I) That the plaintiff's Bank Ball game is a game of amusement and skill; (II) That the plaintiff's Bank Ball game is not " readily convertible " within the meaning of section 982 of the Penal Law, and (III) That no license is required under the Administrative Code of the City of New York for the operation of the plaintiff's Bank Ball game.

The plaintiff is also entitled to an injunction, pending the ultimate decision of the courts of this State in this case, enjoining and restraining the defendants, their deputies, agents, servants or employees from destroying or directing the destruction of any of the games in question; nothing herein contained, however, to be construed as in any other way restraining any of such persons from instituting any criminal proceedings or otherwise enforcing the criminal law against any person or corporation by reason of the operation of plaintiff's Bank Ball machine, in violation of the Penal Law of the State of New York.

Judgment accordingly, without costs. Submit same upon notice.