OPINION OF THE COURT
Samuel L. Green, J.
This is a CPLR article 78 proceeding. Petitioners question the application and constitutionality of a 1952 City of Buffalo Ordinance (ch 7, § 27) which regulates the licensing of coin-operated amusement devices. They seek declaratory and injunctive relief. Petitioners contend that the ordinance is substantively vague, procedurally deficient, unevenly applied and beyond the legitimate exercise of the police power of the Buffalo Common Council. Petitioners suggest that because public concern about gambling has changed significantly during the last 30 years the ordinance represents a regulatory scheme whose time has come and gone.
We have been asked to decide these constitutional issues, ably briefed and argued by counsel, and to convert this article 78 proceeding to a declaratory judgment ac *354 tian. (Matter of Kovarsky v Housing & Dev. Admin, of N. Y. City, 31 NY2d 184.) We recognize, of course, that legislative enactments carry with them a strong presumption of constitutionality (Montgomery v Daniels, 38 NY2d 41, 54; People v Pagnotta, 25 NY2d 333, 337) and that courts should not concern themselves with the wisdom of legislation nor substitute their judgment for that of the Legislature. (Lincoln Bldg. Assoc, v Barr, 1 NY2d 413; Thompson v Wallin, 301 NY 476.) Therefore, we decline the invitation because considerations of propriety and long-established practice instruct us to refrain from reaching the constitutionality of a statute when another . less intrusive ground for reconciling the competing interests exists. (Ashwander v Valley Auth., 297 US 288, 331, 346-348 [Brandeis, J., concurring].)
We view the sole issue in this proceeding to be whether respondents’ blanket policy of denying licenses to petitioners. to distribute coin-operated video games constitutes an arbitrary and capricious exercise of administrative discretion pursuant to CPLR 7803 (subd 3).
On September 3, 1980, the petitioners filed this action. On September 2, 1980, a stay, pursuant to CPLR 7805, was granted by Justice Theodore S. Kasler which enjoined respondents from enforcing the Buffalo ordinance against petitioners and their customers and prohibited further interference with petitioners’ operation of coin-operated video games located on premises within the City of Buffalo. On September 19, 1980, we continued the stay pending final resolution of this proceeding.
We reviewed all the pleadings and memoranda and determined that a hearing pursuant to CPLR 7804 (subd [h]) was necessary. The hearing commenced on December 1, 1980 and lasted two days. The court realized that it could not fully understand the exact nature and operation of the video games from the testimony of the witnesses. Counsel requested that the court view the machines at the warehouse of one of the petitioners. The court refused and suggested that petitioners bring the machines into court. The operation of four video games (Space Invaders, Super Break Out, Double Play and Circus) and one bowling game (Taurus Bowler) was de *355 scribed and demonstrated by both an experienced player and a novice.
Petitioners are 16 distributors of coin-operated amusement devices including the 6 models of video games which are the subject of this proceeding. (Space Invaders, Galaxian, Double Play, Lunar Rescue, Asteroids and Cosmic Guerilla.) Between August 15, 1980 and August 21, 1980, petitioners submitted applications to respondent Hahn, the city director of licenses and permits, for approval of licenses for coin-operated video games at numerous locations within the City of Buffalo. In response to these applications the petitioners received the following notice:
“We have been informed by the Police Department that certain coin-operated amusement devices cannot be approved as presently delivered by the manufacturers.
“We will no longer accept applications on these machines and their presence on location will result in immediate court action.”
We note that some of the petitioners involved in this lawsuit commenced an article 78 proceeding a few years ago to annul respondents’ denial of licenses for coin-operated bowling machines. (United Granite Bowler and Williams Cherokee Bowler.) However, counsel for the City of Buffalo stipulated and agreed that these bowling machines should be licensed even though they offered extended play. On March 23, 1978, a consent judgment was entered before Supreme Court Justice Frank R. Bayger. Licenses for these and similar .bowling machines have been granted, without exception, since that time.
The typical bowling machine now licensed contains five different games: regular, flash, one-shot, repeat strike, and strike-90. The rules for each game are prominently posted on the machine. Each game has 10 frames and is played by sliding a metal puck with one hand down a rectangular alley. In each game the pins are eliminated as the puck crosses over various metal eaves located directly in front of the pins causing the pins to move backwards and upwards off the alley. In the regular game a player may receive two extra shots in the *356 10th frame for a strike and one for a spare at which time the game is ended. In the flash option, lights dart across the alley directly in front of the pins. If a player is skillful enough to throw a strike when the flashing light is directly in front of either the 1-2 or 1-3 pocket, the player receives one extra shot for a strike in whatever frame the strike is made. In strike-90 there is no limit to the number of extra shots a player may receive. As long as he keeps striking the particular frame remains the same. In this game, a skillful player could continue to play forever and never go beyond the first frame.
The Space Invaders model which petitioners seek to license is representative of the video games involved in this proceeding. Complete operation instructions appear on the machine. Two large buttons at the bottom left of the machine control lateral movement of three laser bases which are provided each player at the start of the game. The laser bases are located at the bottom of the video screen. The space invaders are actually projectiles which move vertically at uniform speeds from top to bottom of the video screen which is immediately in front of the player. The invaders can shoot back at the player and when such shots occur, a sound is emitted and the shot is visible on the video screen. The object of the game is for the player to erase the invaders before they destroy the player’s laser bases. He does this by pressing a button on the bottom right of the machine. This controls the player’s electronic blip fire from the laser base he is moving at any given moment.
On each machine, prominently displayed in large capital letters, is the notice: “1 BONUS LASER BASE AWARDED AT 1500 PTS.” A player scores points by hitting the invader projectiles with his fire. At various intervals during a game, opportunities for greater scores appear in the form of different colored “mystery ships”. Once a player reaches 1,500 points one additional laser base is awarded, but no more. If a player scores 4,500 points for example, he would receive only one extra laser base, not three. Once a player loses all of his laser bases the game is over. Depending upon the skill and experi *357 ence of the player, the game may last anywhere from a few seconds to more than 10 minutes.
The electronic circuitry that provides an extra laser base at 1,500 points is contained in a logic board in the back of the machine. There is only one logic board for each type of video game and it cannot be altered in any way by the proprietor of the establishment where it is located. The number of laser bases in a game can be changed by the manufacturer by adjusting a dip switch in the logic board but all the logic boards in Space Invaders have been set for three laser bases and cannot be changed once they are distributed.
Section 27 (subd [1], par [a]) defines a “gambling device” in general terms:
“The term ‘gambling device’ shall mean and include:
“(a) A machine, slot machine, apparatus, paraphernalia or device whether manually, mechanically, electrically or otherwise operated, in or upon which a game or contest involving an element of chance may be played and the machine or device may be operated by one or more persons, singly or collectively, upon and as the result of, the insertion of a piece of money or coin, or other object for which a fee, charge, or other consideration is imposed directly or indirectly.” I find that the video games which petitioners seek to distribute are games of skill and therefore are not gambling devices. They depend upon eye-hand co-ordination, reflexes, muscular control and above all, concentration. Proper timing in aiming and firing is essential. The eyes and hands of an operator of a video game are in constant motion. The player must continually adapt to instantaneous changes in the position of his laser bases relative to the location of the invader projectiles. The amount of physical skill and energy required to successfully play a video game is enormous. As demonstrated at the hearing, a skillful player who had played Space Invaders at least 20,000 times scored over 7,500 points in less than five minutes and still had the original three laser bases plus the one extra laser base he received after 1,500 points. Another player who never operated a Space Invader game scored *358 only 20 points in 15 seconds before the game ended. A player must maintain a consistent level of skillful play to get extra shots in a video game whereas in a bowling game a player could miss every shot for the first nine frames and still acquire extra shots in the 10th frame as a result of throwing a strike or spare.
Respondents contend that the extra ball awarded to a bowler if he strikes in the 10th frame of a regulation game differs from the extension of playing time awarded by attaining a particular score on the video game. They maintain that the former is an integral part of the rules of bowling and results no matter what the player scores in the preceding nine frames, while the latter is a valuable reward for a high score and not the result of a specific throw at a specific time. However, this distinction is insignificant. The key to each game is skill, not score, and skill triggers extra playing time in both games. The fact that the games may have slightly different internal rules does not justify exempting one amusement device and prohibiting the other. Moreover, respondents ignore the fact that the extended play available in each frame of some of the optional games on a typical bowling machine had nothing to do with the traditional rules of bowling.
I find that the similarity between the operation and extended play features of coin-operated video games and bowling games is substantial. Each game: (1) assures that a player’s performance is dependent upon skill, aptitude, co-ordination and concentration; (2) possesses lights, electric scoring and emits noises; (3) requires one object to strike another in order to score; (4) requires hand movements to affect the speed and angle at which a projected object strikes a targeted object; (5) offers the proprietor no stake in the outcome of the game; (6) does not provide a prize, token or other valuable reward; and (7) permits a player to secure extra turns if he is skillful enough to achieve a particular score or throw.
Since the ordinance does not specifically outlaw either bowling or video games, and since the two types of coin-operated amusement devices are substantially similar in all important respects, respondents’ indiscriminate inter *359 pretation and application of the ordinance is an abuse of administrative discretion. (Matter of 303 West 42nd St. Corp. v Klein, 46 NY2d 686; Matter of Pell v Board of Educ., 34 NY2d 222.)
License director Hahn, no doubt aware of these striking similarities, candidly testified that in his estimation, video games were not gambling devices. Had the ordinance given him the sole power to issue licenses, he would have approved petitioners’ applications for the same reasons that he approved licenses for more than 300 bowling games since the stipulated judgment entered on March 23, 1978. However, the statute provides that the licensing decision must be shared by the commissioner of police. “(2) (a) Each of such devices has been examined and approved by the commissioner of police and the director of licenses and permits or their authorized representatives, such device to be examined at the convenience of and at the location and place as determined by the director of licenses and permits.” (Emphasis added.)
License director Hahn testified that in practice, a distributor first places a coin-operated amusement device in a designated location (tavern, bowling alley, etc.) and then submits an application form to his office, which he briefly checks to see if all questions have been answered. He then forwards the application, without recommendation, to the police commissioner who has delegated authority to examine and inspect each machine to Russell Agnello, supervisor of police radio. The sum of Mr. Agnello’s training consisted of a year of radio school in 1947, a stint at American Radio and TV in 1950, attendance at the Buffalo Radio Institute in 1951 and a course in advanced electronics in 1951-1952.
Mr. Agnello’s testimony revealed that the statutory requirements were routinely ignored. Under cross-examination, he admitted that he never operated any of the video games at issue and in fact did not know how they worked. He never disassembled the machines and knew nothing about their circuitry or scoring mechanisms. He simply read the instructions on the machine. If there was any reference to extended play, he designated the ma *360 chine a gambling device and recommended that it be disapproved. He could not explain why bowling games had been licensed by respondents. He never even heard of strike-90, a game prominently displayed on the face of a typical bowling machine. He conceded that games once approved by him could no longer be approved by applying the simplistic extended play test. Further, he did not know who promulgated the test in the first instance. He admitted that he arbitrarily applied the extended play rule when he recommended that licenses for Double Play and Galaxian be denied, even though he knew that they offered no extended play. Mr. Agnello also testified that he has both granted and denied licenses for the same machine under his interpretation of the same provision of the City of Buffalo Ordinance and that both denials and approvals have been permitted to stand with no steps taken by his superiors to rectify his patently conflicting actions.
License director Hahn testified that once he received a recommendation from the commissioner of police, he felt “powerless” to overrule it. Yet, he realized that extended play alone could not render a machine a gambling device because his office, in addition to approving over 300 licenses for bowling machines, had approved licenses for four Space Invaders, identical to the video games at issue here on June 5, 1979, August 15, 1979, November 6, 1979 and May 20, 1980. Moreover, he granted a license for Super Break Out on June 5, 1979 and a license for Circus on October 18, 1979 and both games offer not only extended play but a free game if a player is skillful enough to achieve a particular score.
The power to grant a license carries with it a discretion on the part of the licensing authority to refuse to grant one. However, that discretion must be exercised in conformity with the express or clearly implied standard, policy or purpose of the licensing law. (Matter of Bologno v O’Connell, 7 NY2d 155.) Arbitrary action cannot elude judicial reach by the plea that it was no more than the use of proper administrative discretion. The moment such action is shown to be arbitrary, it ceases to be discretionary. (Matter of Pell v Board of Educ., 34 NY2d *361 222, 231, supra; Matter of Barry v O’Connell, 303 NY 46, 58, 59; Matter of Travel House of Buffalo v Grzechowiak, 31 AD2d 74, affd 24 NY2d 1034.) The fact that license director Hahn approved petitioners’ video games while respondent police commissioner, through his agent, Mr. Agnello, disapproved them by applying an indefensible and overly simplistic administrative ruling in the absence of any actual examination of the machines, renders respondents’ wholesale policy of denying licenses to petitioners arbitrary and capricious.
Proper judicial review requires disclosure of the standard which the administrative agent has applied. (Matter of Montauk Improvement v Proccacino, 41 NY2d 913, 914.)
Respondents’ notice of August 21, 1980 provided petitioners with no explanation why their applications for licenses were denied. Petitioners were notified only that respondents were “informed by the Police Department that certain coin-operated amusement devices cannot be approved as presently delivered by the manufacturers.” Petitioners were entitled to a clear statement of the reasons for the denial. (Carroll v Hastings, 64 AD2d 843.) What they received was no reason at all. This too renders respondents’ decision arbitrary and capricious.
At the hearing, respondents attempted to justify their decision by relying upon section 27 (subd [1], par [c]) of the Buffalo ordinance. Apparently intending to outlaw coin-operated machines similar to pinball machines as they existed in 1952, the common council prohibited licensing of: “(c) A machine, apparatus, paraphernalia or device that is adapted, or may be converted into one that is adapted, for use in such a way that, as the result of the insertion of a piece of money or coin, or other object, such machine or device is caused to operate, or may be operated, and, by reason of an element of chance or other outcome of such operation, unpredictable by him the user may receive, become entitled to receive, a piece of money, credit, allowance or thing of value, or any check, slug, token, or memorandum, whether of value, or otherwise, which may be exchanged for any money, credit, allowance or thing of value, or which may be given in *362 trade, or the user may secure additional chances or rights to use such machine, apparatus, or device, irrespective of whether it may, apart from the element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise, indication of weight or other thing of value.”
The fact that a coin-operated amusement machine allows a player to secure additional chances to play, upon achieving a specified score, does not make the machine a gambling device. An adept player takes nothing away from the machine or the proprietor and wins nothing that can be exchanged for anything of value or credit. Extended play is recompense for some act done rather than a stake upon an uncertain event. In People v Horton (33 Misc 2d 294), the court held that the extra-play feature of pinball machines did not bring them within the “gambling device” prohibition of former subdivision 2 of section 982 of the Penal Law. This provision is identical to section 27 (subd [1], par [c]) of the Buffalo ordinance. (See, also, Washington Coin Mach. Assn, v Callahan, 142 F2d 97; People v One Mechanical Device, 11 Ill 2d 151; State v Fitzpatrick, 89 Idaho 568.)
In any event, respondents may not rely now on reasons not expressed at the administrative level. (Matter of Montauck Improvement v Procaccino, 41 NY2d 913, supra.) Moreover, where a question is one of pure statutory reading and analysis dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency. (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459; Matter of Caraballo v Community School Bd. Dist. 3, 49 NY2d 488, 494.) Respondents’ 11th hour justification is belied by their established practice of licensing over 300 bowling games and several video games which offer extended play and by license director Hahn’s admission that the video games petitioners distribute are not gambling devices under any provisions of the ordinance.
The fact that respondents have licensed four Space Invaders in taverns within the City of Buffalo on four *363 different occasions prior to the institution of this proceeding confirms to the court that there is no rational basis for respondents’ summary denial of licenses to petitioners. These Space Invaders are identical to the video games petitioners seek to license. In fact, the Space Invader machine which was demonstrated before the court at the hearing was one of the four previously licensed. Respondents correctly argue that prior licensing does not result in an estoppel because an erroneous application of the law does not relieve a public official from the obligation to apply and enforce it correctly thereafter. (Matter of Albert Simon, Inc. v Myerson, 36 NY2d 300, 303; but see, also, Bender v New York City Health & Hosps. Corp., 38 NY2d 662, 668; Brennan v New York City Housing Auth., 72 AD2d 410, 413-414.) Yet petitioners established that respondents have not taken any steps to revoke the four previously issued licenses for Space Invaders, the hundreds of licenses for bowling machines approved since March 23, 1978, or the licenses for various other video games which offer at least as much opportunity for extended play as the six models of video games at issue in this proceeding.
The fact that an element of chance is involved in the operation of a machine does not make the machine a gambling device. There is little in life that does not involve some element of chance. The litmus test for identifying a gambling device is whether skill or chance predominates in the operation of the machine. (People ex rel. Ellison v Lavin, 179 NY 164; Amusement Enterprises v Fielding, 189 Misc 625; People v Cohen, 160 Misc 10; see, also, Penal Law, § 225.00, subd 1.) Dice and roulette are games of chance. Video games are games of skill.
By incessantly asking questions, courts can do a substantial amount to insure that agencies which are entrusted with addressing a particular problem are actually looking for purposeful solutions instead of acting, or failing to act, out of prejudice or ignorance. The issues petitioners present invite serious reflection on the purpose of our gambling laws. Courts do not exist in a vacuum. Traditionally, we have been concerned with the protection of substantial interests against governmental *364 encroachment and have been acquainted with the ordinary sentiments, feelings and sensibilities of the people among whom we live. (Murray v La Guardia, 291 NY 320, 326, cert den 321 US 771; Rowland v Miller, 139 NY 93, 101.)
While we recognize that the general police power to regulate gambling has rarely been questioned (People ex rel. Ellison v Lavin, supra; People v Wolosky, 296 NY 236) we also believe that the justification for a rule once found compelling may no longer withstand scrutiny, particularly when the rule is unsupported by favorable tradition and is judged freely by its reason. (California v Minjares, 443 US 916 [Rehnquist, J., dissenting].) For example, the tortured and haphazard interpretation of the Sunday blue laws could not be condoned because “[a] concomitant effect of [the statute’s] unenforceability [was] an erosive disrespect for the law which should not be tolerated in the name of legislative latitude.” (People v Abrahams, 40 NY2d 277, 285.) Where the administration of an ordinance lacks any rational connection to the law’s purpose, it will not survive close judicial examination.
The purpose of the Buffalo ordinance is not clear because there is no legislative declaration of purpose to rationalize its enactment. However, judicial notice of public records (Hunter v New York Ontario & Western R.R. Co., 116 NY 615, 621, 622) reveals that a massive pinball scandal shocked the city in 1950 and 1951. A Grand Jury investigation accused several city officials of accepting over $1,600 a month from a “slush fund” amassed by local distributors of pinball games. (Buffalo Courier Express, Dec. 6, 1952, p 1.) A deputy police commissioner, two police captains, several councilmen and owners of small taverns, were indicted by the Grand Jury. (Buffalo Courier Express, Jan. 15, 1952, p 1.)
In 1952, pinball was a game of chance. The ordinance specifically outlawed pinball machines because a player could take the money value of free games from the tavern owner instead of continuing to play. Thus, the primary focus of the ordinance appeared to be aimed at the pinball business and discouraging distribution of similar *365 games of chance that might offer illegal payoffs to satiate racketeering appetites.
A few years ago, when the same Buffalo ordinance was challenged by distributors of pinball machines, the court suggested that if the ordinance “has outlived the legitimate concern of the proliferation of gambling and gambling devices that it originally set to guard against, it is for the Buffalo Common Council to investigate and legislate accordingly.” (Wnek Vending & Amusements v City of Buffalo, 96 Misc 2d 983, 992-993.) At the hearing in the instant matter, license director Hahn testified that he had appeared before the Buffalo Common Council on several occasions to discuss the regulation of coin-aperated amusement devices and had requested that the common council repeal the ordinance.
We note that the interpretation of the City of Buffalo Ordinance has been litigated in Supreme Court on three occasions within the past two years. (Wnek Vending & Amusements v City of Buffalo, supra.) This is both costly and time consuming for all involved. We believe that the Buffalo Common Council should either heed the advice of license director Hahn and repeal the ordinance in its present form or consider adoption of a new ordinance that reflects the rapidly developing technology in electronic amusement devices.
Legislators must be sensitive to the specific interests and values involved in their exercise of the police power. In the area of the regulation of gambling activities certainly morality cannot be at issue when our State is promoting gambling in lotteries and off-track betting, when daily number winners are announced in the newspapers and on television, when young children may purchase 50 cent lottery tickets at the neighborhood supermarket and when many religious groups organize weekly bingo games. When the relationship between standards of morality and the law is completely severed the ends of justice will never be realized. (People v Acme Markets, 37 NY2d 326.)
License director Hahn was asked by the common council to survey the communities surrounding the City of *366 Buffalo and he reported to the council that every municipality, without exception, permitted video games. Many of these towns and villages do not even require licenses to operate the games. Moreover, petitioners refer us to courts in other jurisdictions which discern no significant difference between bowling games and pinball games. (People v Palazzolo, 62 Mich App 140; Cossack v City of Los Angeles, 11 Cal 3d 726; Crystal Amusement Corp. v Northrop, 19 Conn S 498; State v Fitzpatrick, 89 Idaho 568, supra; People v One Mechanical Device, 11 111 2d 151, supra; McNeice v City of Minneapolis, 250 Minn 142; State v Bloss,_Hawaii_, 613 P2d 354.)
Today, coin-operated video games are distributed to shopping malls, movie theatres, bowling alleys, roller rinks, pizzerias, and neighborhood grocery stores. Video games, originally introduced in Japan several years ago and mass-marketed in this country for the last 18 months, have recently been adapted for use on television screens for home entertainment. A recent Space Invaders competition in New York City, sponsored by a reputable manufacturer and distributor of video games, attracted over 4,000 entrants and awarded as the grand prize, not surprisingly, a $2,000 Asteroids table top video game. (New York Times, Nov. 9, 1980, p 24.) Thus, the contemporary context in which video games are manufactured, distributed, and operated bears little resemblance to the Buffalo atmosphere in 1952.
Webster’s Third International Dictionary defines capricious as “given to changes of interest or attitude according to whims or passing fancies; not guided by steady judgment, intent or purpose; wholly without any consistent and discriminating standards; whimsical.” We believe this aptly describes respondents’ exercise of discretion in this case.
Petitioners have convincingly demonstrated that video games are not gambling devices as defined in section 27 of chapter VII (subd [1], par [a] or [c]) of the City of Buffalo Ordinance and that respondents’ wholesale policy of denying licenses to petitioners to distribute these games is irrational, arbitrary, capricious, an abuse of *367 administrative discretion, and at odds with the intended purpose of the ordinance.
The time has come for the City of Buffalo to join its neighboring communities and to enter the electronic age of coin-operated amusement.
Respondents are directed to issue licenses to petitioners for the following coin-operated video games: Space Invaders, Galaxian, Double Play, Lunar Rescue, Asteroids and Cosmic Guerilla. Since we do not reach the constitutional issues presented, all other relief requested in the petition is denied.