"In the Matter of Travel House of Buffalo, Inc., Appellant, v. Edward A. Grzechowiak, City of Buffalo Director of Licenses, et al., Respondents.
Fourth Department, December 5, 1968."

In the Matter of TRAVEL HOUSE OF BUFFALO, INC., Appellant, v. EDWARD A. GRZECHOWIAK, CITY OF BUFFALO DIRECTOR OF LICENSES, et al., Respondents.

Fourth Department, December 5, 1968.

*Hodgson, Russ, Andrews, Woods & Goodyear (Victor T. Fuzak* of counsel), for Travel House of Buffalo, Inc., appellant.

*Anthony Manguso, Corporation Counsel,* for Edward A. Grzechowiak, respondent.

*Raichle, Moore, Banning & Weiss (James O. Moore, Jr.,* of counsel), for Van Dyke Taxi & Transfer Co., Inc., respondent.

*Charles J. McDonough* for Madison Taxi of Buffalo, Inc., respondent.

*Robert P. Freedman* for City Service Taxicab of Buffalo, Inc., respondent.

*John J. Olszewski,* petitioner in person.

DEL VECCHIO, J. This is an appeal from a judgment dismissing the petition in an article 78 proceeding by which petitioner sought to annul the action of respondent City of Buffalo Director of Licenses in renewing certain taxicab licenses for the year 1965 and to compel him to accept and act upon applications for such licenses filed by petitioner. Appeal is also taken from an order denying petitioner's motion to set aside the judgment.

In 1930 the City of Buffalo, recognizing that the taxicab business was a matter of public concern and interest, adopted ordinances regulating such business within the city. Section 302 thereof provided:

"LICENSE REQUIRED — APPLICATION FOR LICENSE — CONDITIONS GOVERNING. No person shall use any motor vehicle in the conduct of a taxicab business unless a license *therefor* issued by the director of licenses is in full force and effect.

"No taxicab shall be licensed unless the same is equipped with a taximeter of approved design and in good working order.

"Application for such license shall be made to the director of licenses by the owner, in writing, duly sworn to, upon forms to be furnished by said director, and shall show the owner's name and address, the motor number and make of the vehicle, the year manufactured, the New York state license number attached thereto, the size of the tires used, and the make, type and number or other descriptive designation of the taximeter, together with an accurate and complete statement of the color of said taxicab, and if more than one color, a description of the color design thereof. The director of licenses may require such further information as he deems necessary.

"The director of licenses *shall* cause the motor vehicle described in the application to be inspected and the taximeter attached thereto to be tested. If the motor vehicle is found to be clean and in proper condition for the safe transportation of passengers, and the taximeter attached thereto upon test is found to register correctly, the director of licenses shall issue a license for such vehicle and the taximeter attached thereto shall be sealed. The *director of licenses* shall securely affix to such licensed taxicab on the outside thereof at the rear of the taxicab, in a conspicuous place, a metal plate, showing the number assigned to such taxicab." (Emphasis sup-

plied.) The following sections of the ordinance are also relevant to the present case:

" § 303. RENEWAL — SURRENDER OF LICENSE. The holder of a taxicab license now in force shall be permitted to renew the same annually, *providing all ordinance provisions relating thereto are complied with*, and the application for such renewal is filed with the director of licenses not later than February 15th of each year. * * *

" In case of the disuse for taxicab purposes of any licensed taxicab the holder of the taxicab license may have the same transferred to another vehicle, *with the approval of the director of licenses and the payment of a transfer fee of five dollars ($5.00).*"

" § 305. ASSIGNMENT PROHIBITED — LICENSE FEE. * * * No taxicab license shall be assigned from one person to another, and *no plate attached to a taxicab by the director of licenses shall be transferred from one vehicle to another* except as otherwise herein permitted. * * * "

" § 306. TAXIMETERS. * * * *It shall be unlawful* to change the size of the front wheels or tires of a taxicab or the gears operating the taximeter, or *to change said instrument from one vehicle to another without a reinspection and approval of the director of licenses.*" (Emphasis supplied.)

In 1964 the Director of Licenses had issued 212 licenses for the operation of taxicabs by fleet operators (the total number authorized by the ordinance) to respondent licensees as follows: 122 to Van Dyke Taxi & Transfer Co., Inc., 35 to Madison Taxi of Buffalo, Inc., and 55 to City Service Taxi of Buffalo, Inc. In January, 1965 petitioner Travel House of Buffalo, Inc. and intervenor-petitioner John J. Olszewski paid a fee to register their names with the Director of Licenses for the purpose of being considered for fleet licenses in the event that any should become available through abandonment, surrender or revocation. About the same time, the three named fleet operator-licensees filed applications for renewal of the licenses then held by them. Because of complaints filed with the Director charging that Van Dyke had discontinued use and operation of 60 licensed vehicles in May or June, 1964 he withheld issuance of 60 renewal licenses to Van Dyke pending an investigation, among other things, as to why it had transferred 60 licenses to new taxicabs without filing applications for the transfers, without payment of the required transfer fees, and without inspection. Mr. Downey, president of Van Dyke, appeared before the Director and presented both oral and written state-

ments to the effect that during the 25 years he had been with Van Dyke he had never heard of a $5 fee for car-to-car transfers of taxicab licenses; that the company had never paid any such fee; that it had never made application to the Director for permission to make transfers of licenses during the year; and that the custom and practice in relation to approving the transfer of licenses from an old licensed vehicle to a new vehicle was to wait until the licenses expired in January of each year and not to collect or request a transfer fee in addition to the regular fee. Representatives of Madison and City Service also appeared before the Director and gave similar statements to the effect that fleet operators had never paid $5 transfer fees and had not applied for permission to transfer licenses from one taxicab to another during the year. An Assistant Director of Licenses and an Assistant Corporation Counsel of the City of Buffalo substantiated the statements of the fleet operators as to nonenforcement of the transfer requirements.

Relying upon all of the foregoing, respondent Director renewed the 60 licenses of Van Dyke which had been temporarily withheld for 1965.

Thereafter, petitioner instituted this proceeding to review the renewal of these and other licenses held by respondent fleet operators. An extensive hearing was held at which it was clearly established that the statements given to the Director by the fleet operators and by the Assistant License Director were untrue; that from the ordinance's adoption in 1930 until at least 1958 the requirements thereof concerning car-to-car transfers were consistently enforced and applied to all taxicab owners including Van Dyke which had filed hundreds of applications with the License Directors in order to obtain prior permission to make car-to-car transfers and had paid the required $5 fee. Testimony was offered to show that in 1958 the prior License Director, Samuel Sacco, had instituted a policy, at the request of Van Dyke, of not requiring it to make application for year-end car-to-car transfers until it became time to renew the licenses in January and of not collecting a transfer fee. However, the ordinance had always been enforced against individual taxicab owners and transfer fees had been paid by other fleet owners as late as 1962. Furthermore, the supposed 1958 change in policy was not evidenced by any written regulations, rules or directives and an employee of Van Dyke, subsequently vice-president, testified he never had any knowledge of the purported custom and practice.

It is conceded that in May and June, 1964 Van Dyke did transfer 60 taxicab licenses from the vehicles for which they

had been issued to 60 new vehicles without securing prior permission of the Director of Licenses and without payment of a $5 transfer fee for each taxicab; that at the time of the license transfers the medallions indicating issuance of a license to each cab and the taximeters attached thereto had been removed and affixed to the new cabs without notice to the Director, without inspection of the new cabs, and without reinspection and approval of the taximeters. In renewing these 60 licenses for the year 1965 the Director relied upon the false statements made to him by representatives of the three fleet operators and by his Assistant Director to the effect that the transfer provisions of the taxicab ordinance had never been enforced against fleet operators.

Upon the foregoing proof the trial court found that the procedure followed with regard to car-to-car transfers was one not described in the ordinance but that the practice of the Director in excusing prior notice and approval of transfers and payment of a transfer fee constituted an administrative interpretation and a practical construction of the ordinance which was permissible because the language of the ordinance was " not conclusive on its face " as to whether notice, approval and payment were required prior to or contemporaneously with transfer of a license; further, that the custom and practice of the Director in excusing compliance with the ordinance had been in effect since 1958 and was such that fleet operators were entitled to rely upon it. It was concluded that the decision of the Director to renew the 60 licenses was not arbitrary, capricious, or improper.

We cannot agree with these conclusions. The ordinance is not ambiguous in its provision that transfers of taxicab licenses must take place " *with* the approval of the director of licenses and the payment of a transfer fee of five dollars ($5.00) ". In view of the obvious intent of the ordinance that taxicab licenses should be issued to vehicles only after they have been inspected and found suitable and safe for the transportation of passengers, the only reasonable interpretation of the language quoted above is that approval of a license transfer, with a concurrent inspection, and payment of transfer fee must occur prior to or contemporaneously with the transfer. In these circumstances, the License Director had no discretion to vary the ordinance and any interpretation or practical construction by him which deviated from and completely disregarded the requirements of the ordinance is irrelevant. " There is no room for the application of the doctrine of practical construction in the case of a statute free from ambiguity or not subject to any

reasonable doubt as to the meaning of its provisions   \*   \*   \* ' Where no ambiguity or doubt appears in the law we think the same rule obtains here as in other cases, that the court should confine its attention to the law and not allow extrinsic circumstances to introduce a difficulty where the language is plain.' " (*People ex rel. West Side Elec. Co.* v. *Consolidated Tel. & Elec. Subway Co.*, 187 N. Y. 58, 67; see, also, *Matter of Hines* v. *La Guardia*, 293 N. Y. 207, 216; *Public Serv. Comm.* v. *Grand Cent. Cadillac Renting Corp.*, 273 App. Div. 595, 598.) The ordinance must be read and given effect as it is written and not as respondent Director or his predecessor thought it should have been written. (*May* v. *Washington Cemetery*, 29 Misc 2d 1046, 1050, affd. 16 A D 2d 931.)

Furthermore, even if practical construction were relevant, it was error to conclude that there had been a well-established custom and practice since 1958 of excusing notice of mid-year transfers until the commencement of the next calendar year and of waiving payment of the transfer fee. Testimony at the hearing demonstrated that any accommodation or arrangement which might have existed related only to transfers of licenses occurring at the end of the year, not in May and June as did the transfers which Van Dyke attempted to effect in 1964; that the deviation from ordinance procedure never applied to individual taxicab owners who consistently complied with the ordinance in making car-to-car transfers and that as late as 1962 fleet operators other than Van Dyke were complying with transfer requirements.

Finally, if practical construction was significant, neither the Director of Licenses, the fleet operators, nor the court below had a right to ignore the history of consistent uniform enforcement of the ordinance prior to 1958. The custom and practice of requiring notice, inspection and payment of transfer fee at the time of transfer between 1930 and 1958 constituted an administrative interpretation and practical construction of the ordinance which was entitled to great weight, if not controlling influence, and should not have been disregarded. (*Matter of Kolb* v. *Holling*, 285 N. Y. 104, 112; McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 129.)

In reviewing the action of the Director in renewing for the year 1965 the 60 taxicab licenses held by respondent Van Dyke, we are not limited to a consideration of the information before the Director for the determination whether his conduct was arbitrary or capricious as charged by petitioners. " Where the grievance is that a public body or officer has in other respect acted arbitrarily or without authority or has failed to perform

a duty enjoined upon him by law, the answer or return to the petition may raise issues of fact which must be determined *upon the evidence presented to the court*". (*Matter of New-brand* v. *City of Yonkers,* 285 N. Y. 164, 175; emphasis supplied.) It is apparent that in renewing the 60 Van Dyke licenses for 1965 the Director relied upon willful, false statements by representatives of fleet operators and of his own staff to the effect that the former had never heard of a $5 transfer fee, had never paid such a fee, had never made application for mid-year car-to-car transfers, and had never been required to comply with the terms of the ordinance. The foregoing statements were subsequently shown by documentary evidence to have been incontrovertibly false and were also irrelevant. The transfers of licenses by Van Dyke in May and June, 1964 without notice to and approval of the Director and without payment of the transfer fee, the removal and reapplication of license medallions without prior consent of the Director and the removal and reinstallation of taxicab meters without reinspection and approval were all violations of sections 302, 303, 305, and 306 of the Buffalo ordinances. In the face of such violations, it was improper for the Director to authorize renewal of such licenses for 1965 in contravention of ordinance section 303, which conditions renewal upon all ordinance provisions relating thereto being complied with. Such renewal in violation of the ordinance was not a discretionary act but was arbitrary, capricious and improper. (*Matter of State Soc. of Professional Engrs.* v. *Education Dept. State of N. Y.,* 262 App. Div. 602, 604.)

The finding of the court below that petitioner had failed to prove any fraud, conspiracy or bad faith on the part of the License Director is beside the point. The question was simply whether the Director's conduct was in excess of that authorized by law — whether it was arbitrary and capricious. "Action which is condemned by these terms is not redeemed by the presence of good faith or even high purpose." (1 N. Y. Jur., Administrative Law, § 189.)

We are satisfied that there is no estoppel which Van Dyke may assert against the enforcement of the ordinance. It was established that Van Dyke knew of the enforcement of the transfer requirements prior to 1958, when it had complied with those requirements; Van Dyke was the moving force which brought about a practice of violation of the requirements with respect to itself, commencing in 1958. In view of its inducement of the violations, it may not now assert that it relied in innocence upon the nonenforcement of the ordinance.

With regard to the issuance of four license renewals to Madison and City Service for 1965, it appeared at the hearing that these respondents had each applied for and received two taxicab license renewals for vehicles which had previously been demolished, junked, or destroyed, and which were no longer in existence at the time the licenses were renewed upon the sworn applications of the fleet operators. There can be no question of the impropriety of these renewals. When the vehicles for which these licenses had been issued were permanently removed from service and not immediately replaced by other vehicles it is obvious that the licenses ceased to be in effect. The ordinance unquestionably contemplates only the licensing of existing vehicles in the possession of the licensees and available for service to the people of Buffalo. When these four licenses became ineffective they were no longer licenses '' now in force '' subject to renewal under section 303 of the ordinance.

We agree with the trial court that the doctrine of unclean hands does not bar petitioner from raising the questions presented or, in the alternative, that intervenor-petitioner, John Olszewski, has the right to raise these questions free from any such claim. The present litigation not only benefits petitioner Travel House, but also serves the interests of the public for whom the taxicab ordinance was enacted and which is advantaged by proper enforcement of its provisions.

It is apparent from a reading of the petition that this proceeding was brought against the named respondent, Edward A. Grzechowiak, in his official capacity as License Director. The omission of the word '' as '' in the title is not fatal and does not change the nature of the litigation. (*Beers* v. *Shannon*, 73 N. Y. 292, 297.) Furthermore, by reason of CPLR 1023, there was no necessity for including the name of the incumbent of the office of Director of Licenses in the title of the action at all. That officer was being sued in his official capacity; accordingly, the respondent could properly have been designated by his official title, without individual name. This statutory provision is expressly designed to '' encourage the use of the official title without any mention of the officer individually thereby recognizing the intrinsic character of the action and helping to eliminate concern with the problem of substitution.'' (2 Weinstein-Korn-Miller, N. Y. Civ. Prac. par. 1023.01.) If the proceeding had in fact been brought against the respondent designated by official title alone, formal substitution of the present incumbent would of course not be required. Under the provision of CPLR 1019 there is no question that this litigation was properly continued when the present incumbent assumed

the office of Director of Licenses. There has been sound argument presented that in such instance substitution should be automatic, as under Federal procedure. In any event, under the circumstances of this case, including the years this proceeding has been before the courts without any objection, we will deem that a motion to allow the action to be carried on against the " Director of Licenses " and to omit the name of Edward A. Grzechowiak was made and granted, and direct that the order appealed from be modified by eliminating the name of Edward A. Grzechowiak. (See 2 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 1019.05; *Matter of Trimble* v. *O'Brien,* 283 App. Div. 920, affd. 308 N. Y. 897.)

For the reasons stated, the judgment and order should be reversed and the 64 licenses discussed should be annulled, together with any subsequent renewals or transfers thereof; inasmuch as there is no practical purpose to be served by the issuance of such licenses for the year 1965, the Director of Licenses should act upon the 1965 applications for unissued licenses as though filed for 1969 in the order in which filed in 1965 and prior to any other applications filed subsequent thereto in accordance with the provisions of section 303 of the ordinance as herein construed.

WILLIAMS, J. (dissenting). In this proceeding, of an equitable nature, the majority make a determination which, in effect, finds that something wrong was done and then rewards the wrongdoer, Charles Montana, who is the principal factor in Travel House of Buffalo, Inc. This is so particularly as to Van Dyke, but his general behavior and his conduct applies equally as to City Service and Madison so far as he is trying to gain an advantage from his own acts of which he is now complaining and which this court has found to be improper.

At the pertinent times, Charles Montana was a vice-president and a director of Van Dyke. He was in charge of licenses and applications therefor, was in contact with the Director of Licenses of the City of Buffalo in relation thereto, and everything that was done wrong, if it was wrong, was done by him acting for Van Dyke, and not by anyone else. Furthermore, consideration and understanding should be given to the taxi fleet operators involved because they did everything that the city asked them to do and followed completely the directions of the City of Buffalo and the Director of Licenses as to how the law should be interpreted and applied.

The technical construction which the majority has given to this litigation produces a result that is harsh in many respects

and certainly not what can be described as just and equitable. After all, it is justice that we seek and not a highly technical result which places hardship where it does not belong and rewards a primary wrongdoer, if there was a wrong. We must consider the fact that even though this was handled by Charles Montana he now complains about the way he himself handled these matters — in fact, that is the basis of this entire lawsuit.

It is the City of Buffalo, representing its population, that is primarily interested, because if any fees were not paid it was the City of Buffalo that suffered. Nevertheless, the city throughout has opposed the position of Travel House and has tried to establish and justify its own position and its construction of the ordinance and the manner of Van Dyke's operations. In this respect, although the City of Buffalo is not a party to this proceeding, it is the real party in interest. The defendant Grzechowiak, who is no longer Director of Licenses of the City of Buffalo, was not sued *as* Director of Licenses; he is simply described "Director of Licenses". Nor has there been any effort to substitute in his place his successor, Sacco, who would be affected by the decision in this matter. There is a serious question as to whether this court has any jurisdiction to direct the present Director of Licenses to do anything.

From a judicial standpoint, this entire controversy may have become moot. At one time during the dispute, when there was a stay in force, Van Dyke offered to pay anything that would be due to the city on the basis of a strict and highly technical construction of the ordinance, but the Director of Licenses refused to accept such license fees when they were tendered, because of the stay. However, thereafter the stay was vacated and the 1966 licenses were issued. In 1967 and 1968 licenses were issued in regular course, and the fees mentioned in the ordinance were then accepted. While it does not so appear in the record, it is stated in a footnote in the Van Dyke brief (p. 17, n. 9), and it is not disputed in any way by the petitioner. Therefore, this appeal involving the 1965 licenses, may well have become academic and moot. If the Director of Licenses acts as if applications were filed for 1969, then there is no problem at all.

It appears from the entire record that Charles Montana, the head of Travel House, is a man of doubtful character at best. Some of his testimony is almost unbelievable as a matter of law, particularly when he said that he could not understand some of the records of his own drivers as to pickups and the like. This is incomprehensible coming from a man who was, and is in charge of the petitioner and its taxicab operations through its subsidiary, Yellow Cab Corporation, and who had

the sophistication and experience of many years' activity in the taxicab fleet business. Of course, in any event, the Director of Licenses would not have to grant the petitioner's applications, but merely consider them and, if he does so, all such matters should be considered on those applications, *as they should be here,* concerning the operation of a fleet of cabs in a city of the size and complexity of Buffalo.

The Trial Justice found no fraud on the part of the city. It appears that the method of interpreting and applying the ordinance was largely a matter of convenience, economy, and lack of manpower on the part of the city. The respondents should not be penalized for that.

I would affirm the judgment as to all parties involved.

BASTOW, P. J., and WITMER, J., concur with DEL VECCHIO, J.; HENRY, J., concurs in all respects except that he dissents from that part of the opinion which says that the Director of Licenses should act upon petitioner's application for unissued licenses as though filed for 1969. WILLIAMS, J., dissents, and votes to affirm the judgment as to all the parties involved.

Judgment and order reversed on the law and facts, with costs, and judgment granted to petitioners, in accordance with the opinion by DEL VECCHIO, J.